UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RHONDA LUCAS,

                Plaintiff,               Case No. 2:22-12804
                                      District Judge Paul D. Borman
v.                                 Magistrate Judge Anthony P. Patti

HENRY FORD HEALTH
SYSTEM,

                Defendants.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION TO DENY
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 17) AND
GRANT DEFENDANT'S MOTION FOR JUDGEMENT ON THE
ADMINISTRATIVE RECORD (ECF No. 16)**

I.    **RECOMMENDATION**:  The Court should **DENY** Plaintiff's Motion for

Summary Judgment (ECF No. 17) and **GRANT** Defendant's Motion for Judgment

on the Administrative Record. (ECF No. 16.)

II.    **REPORT**

    **A. Background**

        **1.  Plan Terms**

    Plaintiff Rhonda Lucas was employed as an Integrated Case Management

Supervisor with Defendant Henry Ford Health System ("HFHS"), and covered by

Defendant's short term disability policy.  (ECF No. 17, PageID.1453; ECF No. 16,

PageID.1426.)

On January 1, 2004, Defendant adopted a Salary Continuance Plan (the "Plan") for its employees to "provide salary continuance plan benefits to eligible employees." (ECF No. 14-4, PageID.1345.) On that date, Defendant also entered into a Claim Consulting Agreement with Life Insurance Company of North America ("LINA"). Under the Claim Consulting Agreement, LINA agreed to act as the claims administrator for the Plan on behalf of HFHS.[1]

The Plan provides that it will pay Disability Benefits if the covered employee becomes disabled under the terms of the Plan. (ECF No. 14-4, PageID.1353.) In order to meet the terms of the Plan, the covered employee "must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all the other terms and conditions of the Plan." (*Id.*) Additionally, "[h]e or she must provide the Plan, at his or her own expense, satisfactory proof of Disability before benefits will be paid." (*Id.*) "The Plan will require continued

_____

[1] Plaintiff refers to the Claims Administrator as "New York Life ("NYL"). (*See*, e.g., ECF No. 17, PageID.1455.) Indeed, New York Life Insurance Company was, at one point, a defendant in this case, but was voluntarily dismissed on February 3, 2023. (ECF No. 7.) Defendant explains in a footnote that "[s]ome of the historical documents in the Administrative Record indicate that LINA is a subsidiary of Cigna. LINA is now a subsidiary of New York Life ('NYL'), but LINA has always been the duly appointed claims administrator for the ERISA Plan at issue. (ECF No.16, PageID.1425.) Most of the records in the AR refer to the claims administrator as NYL, but for consistency, and because this distinction does not seem to matter to the parties, I will refer to the claims administrator as LINA.

proof of the Employee's Disability for benefits to continue." (*Id.*) Indeed, in order to be eligible for disability benefits, the Plan requires continued participation by the employee: "Failure of a claimant to cooperate with the Plan in the administration of the claim may result in termination of the claim." (ECF No. 14-4, PageID.1359.) "Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due." (*Id.*)

Under the terms of the Plan, an "Employee is considered Disabled if, solely because of a covered Injury or Sickness, he or she is unable to perform all the material duties of his or her Regular Occupation." (ECF No. 14-4, PageID.1350.) "Regular Occupation," in turn, is defined as: "The occupation the Employee routinely performs at the time the Disability begins. In evaluating Disability, the Plan will consider the duties of the occupation as it is normally performed in the general labor market in the national economy. It is not work tasks that are performed for a specific employer or at a specific location." (ECF No. 14-4, PageID.1361.)

### 2. Plaintiff's Claim

Plaintiff was 59 years old at the time she allegedly became disabled, and she was working for Defendant as an Integrated Case Management Supervisor. (ECF No. 14, PageID.87.) She had earned a master's degree in social work from Wayne

3

State University, and had worked for Defendant for 22 years.  (ECF No. 14, PageID.87.)

She initially went off work complaining of being "stressed and worried about [her] job," having feelings of despair, lack of concentration, fear, crying and anger spells, irritability, inability to be optimistic, insomnia, nightmares, anxiety and worry, sadness and depressed mood, and recent memory problems.  (ECF No. 14, PageID.86-87.)  She was diagnosed with generalized anxiety disorder and major depressive disorder (single episode, moderate).  (ECF No. 14, PageID.88.)  Her condition did not improve and, in December 2021, she "reported feeling moderately worse than the previous session."  She indicated she was "feeling down" because both her daughter and her sister were in the Intensive Care Unit ("ICU").  (ECF No. 14, PageID.99.)

Benefits were initially approved commencing on November 8, 2021.  The Policy provides for 26 weeks of coverage, so the maximum coverage period was November 8, 2021 to May 8, 2022.  (ECF No.14, PageID.648.)  On January 6, 2022, LINA sent Plaintiff a letter stating that it needed additional documentation from her and her physicians and that if it did not receive the documentation by January 19, 2021, it would close her claim.  (ECF No. 14-2, PageID.979.)  LINA indicated it needed "supporting office visit notes from December 28, 2021, to

present," and "[t]est results, treatment plan, updated restrictions and limitations and an estimated return to work date." (*Id.*)

On February 4, Plaintiff was again advised that LINA was in need of "supporting office visit notes from January 29, 2022, to present," and "[t]est results, treatment plan, updated restrictions and limitations and an estimated return to work date." (ECF No. 14-1, PageID.802.) LINA advised Plaintiff that if it did not receive the medical information by February 17, 2022, it would close her claim (*Id.*) Letters were also sent to Plaintiff's treating physicians. (*See, e.g.,* ECF No. 14-1, PageID.794, 804.)

On February 17, 2022, LINA sent notice to Plaintiff that her short term disability benefits would be discontinued and Plaintiff would not receive benefits beyond January 29, 2022. (ECF No. 14, PageID.38.) In summarizing how the claim decision was reached, LINA noted:

> On February 4, 2022 you were advised that we needed medical information regarding your diagnosis and functional abilities in order to determine whether you satisfied the definition of disability as defined under your contract. We are in need of a completed Medical Request Form and complete copies of your office exam notes from your visits with your providers Dr. Pierre and Dr. Safo from January 29, 2022 to present. We reached out to you for this information on February 2, 2022, February 7, 2022 and February 10, 2022. You were advised if this information was not received in our office by February 17, 2022, we would make a claim determination based on the information on file. As of February 17, 2022 we have not received any of the information noted above. At this time your claim has been closed and no benefits are payable.

> You have not presented us with a copy of your Social Security Disability
> Insurance (SSDI) award letter. Therefore, that information has not been
> included in our claim decision.

(ECF No. 14, PageID.38-39.)  The notice included information on how to appeal

the decision, noting that appeals must be sent within 180 days of receipt of the

letter.  (ECF No. 14, PageID.39.)  LINA also stated in the notice that the appeal

may include written comments along with "any new information you may have,"

and that "[a]dditional information may include, but is not limited to: medical

records from your doctor and/or hospital, test result reports, therapy notes, etc."

(ECF No. 14, PageID.39.)

On August 12, 2022, within the 180-day appeal time, Plaintiff submitted an

appeal.  (ECF No. 14, PageID.45.)  Along with the appeal, Plaintiff (through

counsel) submitted medical records from the Care and Transformation Center

through April 23, 2022, and then from Thriveworks thereafter.  (ECF No. 14,

PageID.46-47.)

On September 22, 2022, LINA sent a letter to Plaintiff's counsel, indicating

that it had completed a review of Plaintiff's appeal and concluded that the initial

denial was warranted.  (ECF No. 14, PageID.633.)  LINA stated that it based its

review on November 11, 2021-August 10, 2022 psychiatry notes and a Behavioral

Health Specialist review.  (*Id.*)   The letter invited Plaintiff to respond to the

decision and the rationale behind the decision.  (*Id.*)  While the letter detailed how

LINA came its conclusion, it summarized that "medical documentation does not

support a functional impairment beyond January 29, 2022. While exams on file

documented symptoms of depression and anxiety, overall the severity of

psychiatric symptoms and a functional impairment are not reflected in the mental

status exams."  (ECF No. 14, PageID.635.)  LINA gave Plaintiff until October 6,

2022 to respond.  (*Id.*)

Plaintiff responded, through counsel, on October 4, 2022.  (ECF No. 14,

PageID.643.)  Counsel's primary response to the letter was that LINA and its file

reviewer, Ms. Hoyek, required too high of a definition of "disability" in denying

Plaintiff's claim.  Counsel submitted that "[t]he standard of disability is not in this

case 'any occupation', and Ms. H[oyek] erred in requiring a level of impairment

that would prevent one from performing even unskilled tasks."  (*Id.*)  Plaintiff also

submitted an additional medical record from Plaintiff's dentist dated June 22,

2022.  (ECF No. 14, PageID.645.)  The dentist notes indicate "Heavy calc sub and

supra" and "heavy bleeding," and that the patient "hasn't been able to do home

care as needed." (*Id.*)

On October 10, 2022, LINA upheld its prior decision to deny Plaintiff's

claim for continued short term disability benefits.  (ECF No. 14, PageID.647.)

This concluded Plaintiff's administrative appeal process, and she then brought suit

in federal court.  (ECF No. 1.)  The Honorable Paul B. Borman struck the initial

complaint for failure to abide by the local rules regarding font size (ECF No. 2),

and Plaintiff filed an amended complaint on November 21, 2022 (ECF No.3).

Judge Borman referred the matter to me "for all pretrial proceedings, including a

hearing and determination of all non−dispositive matters pursuant to 28 U.S.C. §

636(b)(1)(A) and/or a report and recommendation on all dispositive matters

pursuant to 28 U.S.C. § 636(b)(1)(B)."  (ECF No. 15, PageID.1416.)  Both parties

filed motions for judgment.

### B.  Standard of Review

Legal actions challenging the denial of a claim for benefits under ERISA are

resolved through motions for judgment on the administrative record.  *Wilkins v.

Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998).  The appropriate

standard of judicial review of benefit determinations by fiduciaries or plan

administrators depends on the language of the plan itself. *Metropolitan Life Ins.

Co. v. Glenn,* 554 U.S. 105, 111 (2008).  Where the plan grants discretionary

authority to determine eligibility benefits, "[t]rust principles make a *deferential

standard* of review appropriate." *Id.* (Quoting *Firestone Tire & Rubber Co. v.

Bruch,* 489 U.S. 101, 115 (1989)).  Here, the parties have stipulated that the

standard of review is arbitrary and capricious.  (ECF No. 12, PageID.31; *see also*

ECF No. 14-6, PageID.1399 (setting forth the Plan's delegated discretion).)

A deferential standard requires upholding a denial of benefits unless the decision was arbitrary and capricious; in other words, it must be "possible to offer a reasoned explanation, based on the evidence" for the denial. *McClain v. Eaton Corp. Disability Plan,* 740 F.3d 1059, 1065 (2014) (quoting *Shields v. Reader's Digest Ass'n, Inc.,* 331 F.3d 536, 541 (6th Cir. 2003)).  When reviewing a denial of benefits under ERISA, a court may consider only the evidence available to the administrator at the time the final decision was made. *Wilkins*, 150 F.3d at 618 (citing *Rowan v. Unum Life Ins. Co.,* 119 F.3d 433, 437 (6th Cir.1997)); *see also Jones v. Metropolitan Life Ins. Co.,* 385 F.3d 654, 660 (6th Cir. 2004). This limitation applies to both an arbitrary and capricious and a *de novo* standard of review.  *Miller*, 925 F.2d at 986 (citations omitted).

The arbitrary and capricious standard is not "without some teeth," nor is it a mere rubber stamp to plan administrator decisions. *See McClain,* 740 F.3d at 1064. However, the arbitrary and capricious standard is "extremely deferential and has been described as the least demanding form of judicial review." *Id.* at 1064 (quoting *Cozzie v. Metropolitan Life Ins. Co.,* 140 F.3d 1104, 1107-08 (7th Cir. 1998)).

Plaintiff "bears the burden of proving that the Plan Administrator's decision was arbitrary or capricious; otherwise, the decision of the Plan Administrator 'must be sustained as a matter of law.'"  *Farhner v. United Transp. Union Discipline*

*Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011) (citing *Gardner v.*

*Central States, Se. and Sw. Areas Pension Fund, et al.*, No. 93–3070, 1993 WL

533540, at *3 (6th Cir. Dec. 21, 1993)).

### C. Discussion

ERISA § 502(a)(1)(B) allows a plan participant to bring civil action "to

recover benefits due to him under terms of [the] plan, to enforce his rights under

the terms of the plan, or to clarify his rights to future benefits under the terms of

the plan." 29 U.S.C. § 1132(a)(1)(B).  A plan participant's claim "stands or falls by

the 'terms of the plan.'" *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan,* 555

U.S. 285, 300 (2009) (quoting 29 U.S.C. § 1132(a)(1)(B)).  "In interpreting the

provisions of a plan, a plan administrator must adhere to the plain meaning of its

language, as it would be construed by an ordinary person." *Wallace v. Oakwood*

*Healthcare, Inc.,* 954 F.3d 879, 890 (6th Cir. 2020) (quoting *Shelby Cty. Health*

*Care Corp. v. S. Council of Indus. Workers Health & Welfare Tr. Fund,* 203 F.3d

926, 934 (6th Cir. 2000)).  Therefore, in determining whether Defendant's denial of

Plaintiff's claim was arbitrary and capricious, the Court is guided by the

unambiguous terms of the plan.

To that end, Plaintiff argues that Defendant applied the wrong standards of

"disability" and "own occupation" when denying Plaintiff's benefits.  Plaintiff

further argues that Defendant did not properly address the opinions of Plaintiff's

medical providers, and that Defendant should have arranged for a physical medical exam.  Plaintiff argues that each of these actions by Defendant were arbitrary and capricious.  The Court should disagree.

First, it was not arbitrary and capricious that Defendant did not order an independent medical exam ("IME").  Defendant had at its disposal all the records which Plaintiff herself submitted, and in addition Defendant had a review conducted by a Behavioral Health Specialist.  I am not convinced an IME was required in this case, and the Court should not agree that the lack of one is arbitrary and capricious. *Crox v. Unum Grp., Corp*., 655 F. App'x 490, 494 (6th Cir. 2016) ("Neither the Plan nor ERISA mandates an IME and Crox has pointed to nothing in the record that would indicate that an IME was required here.").

The heart of Plaintiff's argument is that Defendant did not employ proper definitions under the Plan.  As noted above, under the terms of the Plan, an "Employee is considered Disabled if, solely because of a covered Injury or Sickness, he or she is unable to perform all the material duties of his or her Regular Occupation."  (ECF No. 14-4, PageID.1350.)  Plaintiff argues that this is not the definition of disability employed by Defendant.  According to Plaintiff, LINA did not even mention what her regular occupation was in the denial letter, nor did it analyze the material duties of that occupation.  (ECF No. 17, PageID.1461.)  She asserts that, although LINA found that the severity of Plaintiff's psychiatric

11

symptoms and functional impairment were not reflected in the mental status exams (*see* ECF No. 14, PageID.649), LINA did not discuss how severe those symptoms would need to be to be unable to perform her position of Case Management Supervisor. (ECF No. 17, PageID.1461-62.) Plaintiff contends that the final denial letter is too vague to understand LINA's reasoning, but the reasoning tracks that of the opinion of Celia H., the social worker LINA engaged to review Plaintiff's medical records. (ECF No. 17, PageID.1462.) Plaintiff contends that Ms. Hoyek's review, and LINA's reliance thereon, were both arbitrary and capricious.

To start, the Court should reject Plaintiff's attempt to focus the inquiry on Plaintiff's *individual* job, as opposed to her regular occupation, generally. Plaintiff repeatedly argues that Defendant failed to consider "the material duties of her very stressful and demanding occupation" (ECF No. 17, PageID.1460), which Plaintiff claims is "stressful, complicated, and highly skilled." (ECF No. 17, PageID.1468.) But the Plan does not require LINA to look at Plaintiff's *own* job. Instead, the Plan states that "[i]n evaluating Disability, the Plan will consider the duties of the occupation as it is normally performed in the general labor market in the national economy. It is not work tasks that are performed for a specific employer or at a specific location." (ECF No. 14-4, PageID.1361.) Thus, Defendant did not need to consider the particular job duties assigned to Plaintiff or the stress level at

Plaintiff's particular job site.  As Defendant points out, "[m]any courts have upheld a plan administrator's interpretation of 'regular occupation' as meaning a general occupation rather than a particular position with a particular employer." *Schmidlkofer v. Directory Distrib. Assocs., Inc.*, 107 F. App'x 631, 633 (6th Cir. 2004) (citing *Ehrensaft v. Dimension Works Inc. Long Term Disability Plan*, 120 F.Supp.2d 1253, 1259 (D. Nev. 2000) ("This Court finds that the term, 'occupation,' is a general description, not a specific one . . . . A person may not be able to perform a specific job assignment, but still be able to perform the duties generally understood to be part of his or her 'occupation.' For example, a secretary is not disabled from his or her 'occupation' just because he or she cannot also perform additional tasks assigned by an employer, such as moving furniture or lifting heavy objects."); *Dionida v. Reliance Standard Life Ins. Co.*, 50 F.Supp.2d 934, 939 (N.D. Cal., 1999) ("The term 'regular occupation' may be fairly construed to mean 'a position of the same general character as the insured's previous job, with similar duties and training requirements." (quoting *Dawes v. First Unum Life Ins., Co.*, 851 F.Supp. 118, 122 (S.D.N.Y.1994))); *Hanser v. Ralston Purina Co.*, 821 F.Supp. 473, 478 (E.D. Mich. 1993) ("The court finds that defendant's interpretation of the terms 'regular occupation' as meaning the type of work which a covered employee is trained to perform rather than the specific job at which the employee was working when he became ill, is a rational interpretation

supported by the plain meaning of the words." (citation omitted))).  Defendant was

not required to seek out or consider Plaintiff's individualized job description.

*Valeck v. Watson Wyatt & Co.*, 266 F.Supp.2d 610, 620–21 (E.D. Mich. 2003)

(upholding as not arbitrary or capricious the interpretation of both "regular job"

and "regular occupation" as "the kind of work [insured] did" rather than the

"specific job in the specific office and with the specific supervisor and co-workers

with whom she worked").

  Moreover, Plaintiff also asserts that Defendant was arbitrary and capricious

for failing to delineate her job duties, arguing that Defendant could not have given

a proper analysis of whether she is disabled if Defendant did not have a job

description.  However, the Administrative Record does indicate that her position

was "Supv- Integrated Case Mngt," and with an occupational category of

"Officials and Managers."  (*See, e.g.,* ECF No. 14, PageID.662, ECF No. 14-1,

PageID.841.)  Plaintiff does not dispute this occupational category but argues that

more detail should have been sought or analyzed.  However, "[t]he insured

employee bears the burden of proving his or her continuing 'disability.'"  *Calvert*

*v. Firstar Fin., Inc.*, 409 F.3d 286, 289 (6th Cir. 2005).  Other than continuing to

argue how highly complex and stressful Plaintiff's job is, Plaintiff does little more

to point out precisely how her conditions rendered her unable to perform her

Regular Occupation.  In this case, Plaintiff asserts that her generalized anxiety

disorder and major depressive disorder ("Single episode, Moderate" (ECF No. 14, PageID.88)) were severe enough to prevent her ability to perform the duties of her Regular Occupation.  LINA appropriately considered her medical records, and the notes and descriptions of how her conditions manifested themselves in symptoms.

In her briefs, Plaintiff's arguments amount more to a disagreement with the conclusion, rather than identifying how Defendant's decision was arbitrary or capricious.  Plaintiff attacks the report prepared by the Behavioral Health Specialist Defendant engaged, Celia Hoyek.  Plaintiff argues that the Ms. Hoyek placed too high a bar on Plaintiff, taking issue with Ms. Hoyek's observations that Plaintiff could remember events that happened between appointments, that she could perform self-care, and that she was able to visit her adult daughter in the ICU.  (ECF No. 17, PageID.1464 (citing ECF No. 14, PageID.640-641).)  Plaintiff argues that being disabled from one's own occupation does not "require her to dress in mismatched rags, unable to shower or drive herself around town," and that "[i]t would be a severe level of impairment for someone not to remember events found between appointments."  (ECF No. 17, PageID.1464.)  Plaintiff intimates that the level of impairment required by LINA would essentially require Plaintiff to be in a nursing home and/or suicidal before being declared disabled, which is a threshold not required by the Plan.  (ECF No. 17, PageID.1463-64.)  However, I see nothing inappropriate, much less arbitrary and capricious, about a mental

health examiner making note of memory, self-care and abilities in assessing one's mental status. Indeed, Ms. Hoyek also noted from Plaintiff's record that she reported that "she was unable to remember things well and had difficulty focusing" and "self-rated depression and anxiety[,]" while further observing that "mental status exam noted that the customer was alert and oriented, dress appropriate, mood euthymic, affect congruent, insight excellent, memory intact, attention and concentration good and there were no areas of risk[,]" and additionally, "prior exams noting mood euthymic affect congruent, insight and judgment excellent, speech normal" and "mildly irritable discussing disability paperwork, attention variable, memory intact, and thought process unremarkable." (ECF No. 14, PageID.640.) None of these observations, unless considered in isolation and taken out of context, suggest that Ms. Hoyek raised the bar too high or required that Plaintiff "dress in mismatched rags, unable to shower or drive herself around town."

Plaintiff takes issue not just with what Ms. Hoyek put in her report, but what she left out. For example, Ms. Hoyek summarized notes from a March 15, 2022 visit with Nurse Practitioner Belinda Becker, stating "documented that mood was euthymic, speech normal, the customer was alert and oriented, denied all areas of risk and functional status intact." (ECF No. 14, PageID.626.) Ms. Hoyek also reported that "Paxil had been helping with anxiety since the increase." (ECF No.

16

14, PageID.626.)  Plaintiff complains that Ms. Hoyek did not mention that the

same office visit "Symptom Description and Subjective Report" notes that Plaintiff

was still "experiencing feelings of despair, lack of concentration, fear, crying

spells, anger spells, nightmares, and poor recent memory."  (ECF No. 17,

PageID.1465 (citing ECF No. 14, PageID.120).)  While it is true that Ms. Hoyek

did not mention this from the office notes, she also did not mention (nor does

Plaintiff) that the notes further document "Client states that she is feeling okay this

month," and that her "daughter got out of the ICU, and is opening her eyes now,"

and that "her daughter is still on a ventilator and is still on dialysis but she is

feeling hopeful that she will continue to recover."  (ECF No. 14, PageID.120.)  The

notes also indicate that "Client states that her sleep has been better, she is also

taking melatonin at night."  (ECF No. 14, PageID.120.)

Similarly, Plaintiff points to restriction slips indicating that Plaintiff "had

symptoms that would leave her unable to perform her job as a result."  (ECF No.

17, PageID.1466.)  For example, she references a "Mental Medical Source

Statement" from Brianna Banks, who started seeing Plaintiff April 19, 2022.  The

statement indicates that Plaintiff "continues to meet with clinician weekly to

address depressive symptoms and unhealthy thought processing and to develop

coping skills to combat symptoms."  (ECF No. 14, PageID.73.)  The Source

Statement indicates various signs and symptoms exhibited by Plaintiff which could

impact her ability to work, including (but not limited to): decreased energy, poverty of content of speech, mood disturbance, difficulty thinking or concentrating, emotional withdrawal or isolation, flight of ideas, memory impairment, and oddities of thought, perception, speech or behavior." (ECF No. 14, PageID.74.) The report indicates that Banks would expect Plaintiff to be absent more than 4 days per month from work due to her impairments, and marks a significant number of work demands that Plaintiff would find stressful (e.g., speed, precision, deadlines, completing tasks, fear of failure, etc.). (ECF No. 14, PageID.77.) The report indicates three areas in which Plaintiff is unable to meet competitive standards in the workplace (complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in a routine work setting). (ECF No. 14, PageID.75.) The same report indicates seven factors in the "unlimited or very good" column (ask simple questions or request assistance; get along with co-workers or peers; be aware of normal hazards and take appropriate precautions; interact appropriately with the general public; maintain socially appropriate behavior; travel in unfamiliar places; and use public transportation). (ECF No. 14, PageID.75-76.) Four factors exhibit in the column for "limited but satisfactory," and seven factors exhibit in the column for "seriously limited but not precluded."

(ECF No. 14, PageID.75-76.)  In other words, the chart does not overwhelmingly display factors that weigh in favor of Plaintiff being unable to work.  And, *most importantly*, the source statement is dated July 6, 2022, two full months after the eligible disability period had ended.  (ECF No. 14, PageID.78.)  Indeed, Plaintiff did not even start seeing this provider until April 19, 2022, less than three weeks before the disability period expired on May 8, 2022.  Thus, the bulk of the assessment was based on visits outside of the period, a time period where she might have improved, or deteriorated in her conditions and abilities.  As such, to the extent it was reviewed, the report is of ambiguous value and LINA was entitled to give it little weight in either direction.

Plaintiff also points to two restriction slips submitted by her physician Dr. Safo indicating that did not have the ability to work, one dated December 30, 2021, and one dated January 14, 2022.  (ECF No. 14-2, PageID.973, 1009-1010.) Plaintiff further points to portions of the Administrative Record where LINA did not indicate Plaintiff's job responsibilities or job description, and argues that it was arbitrary and capricious for LINA to deny a claim for benefits without a detailed description of Plaintiff's actual job.  (*See* ECF No. 17, PageID.1460 (citing ECF No. 14-3, PageID.1185-86, 1192.)

Additionally, Plaintiff argues that there is no indication that Ms. Hoyek considered the dentist note that Plaintiff submitted after receiving the September

notice of impending denial and request for any additional records.  Indeed,

Defendant stated in its final denial letter that since the dentist note was dated June

22, 2022, it was outside the disability period and therefore "not time relevant."

(ECF No. 14, PageID.648.)  Plaintiff disagrees and argues that the dentist note

rebuts the finding that she was capable of self-care.  The dentist note indicates

"Heavy calc sub and supra" and "heavy bleeding," which, along with the notation

that the patient "hasn't been able to do home care as needed," Plaintiff contends

shows a lengthy time period where her teeth were neglected.  (ECF No. 14,

PageID.645.)  Thus, though the medical record was from outside the claim period,

Plaintiff argues it shows lack of self-care during the claim period.  To the extent

Plaintiff implies it was arbitrary and capricious to disregard this note, I disagree.  A

poor dental visit, on its own, hardly indicates a generalized lack of self-care,

particularly one that would prevent Plaintiff from being able to work.  The note is

outside the disability period, and even if it were within the period, it is simply not

particularly relevant to the disability determination.  It is not the Court's function

here to reweigh the evidence.  *Jackson v. Blue Cross Blue Shield of Michigan Long

Term Disability Program*, 761 F. App'x 539, 544 (6th Cir. 2019) (stating it's not

appropriate to "to reweigh the objective medical evidence and reach an outcome

that supports [the plaintiff's] disability claim, despite [the defendant's reasonable]

decision to the contrary.").

After reviewing Ms. Hoyek's comprehensive report of Plaintiff's medical records, I cannot conclude that her report was arbitrary and capricious, nor can I conclude that LINA and Defendant's reliance on the report was arbitrary and capricious.  She reviewed and summarized the notes, indicating what she found particularly relevant.  She did not need to transcribe every single notation in the files.  Sometimes her notations include impressions that weighed in favor of a finding of a disability, and sometimes they weighed against it.  After reviewing the records, Ms. Hoyek stated her recommendation: "Medical records on file are not supportive of the psychiatric restrictions beyond 1/29/22."  (ECF No. 14, PageID.628.)  Her summary indicated:

> While the exams documented that the customer has presented with symptoms of depression/anxiety[,] overall the severity of psychiatric symptoms and psychiatric functional impairment are not reflected in the mental status exams. The customer has consistently presented to her sessions as alert and oriented, her dress and appearance have been appropriate, and she has consistently denied suicidal/homicidal ideation. While mood has varied from irritable, to depressed, to anxious to euthymic, the exams have overall not described severe psychiatric symptoms. As noted above, the customer has been alert and oriented, speech normal, thought process unremarkable and perceptions normal. While the customer reports that her focus and concentration are not good[,] this is not corroborated by the multiple mental status exams noting that attention /concentration good, memory intact and the customer at her visits has been able to provider [sic] a history of events from incur [sic] as well as between sessions. While recent notes have documented that the customer reported passive suicidal ideation[,] this is not substantiated in the exams which from November to current, have documented that there had been no areas of risk. In addition[,] the recent report of passive suicidal ideation was not associated with any changes in the overall level of treatment in which the customer has been

maintained in routine outpatient therapy generally provided weekly. While at times the customer was seen more than weekly[,] overall treatment, outside of medication changes/adjustments has been unchanged.

In terms of function the customer has presented to all her visits appropriately dressed. She has been able to engage in self-care, has been out of her home visiting daughter who has been hospitalized and has assisted with care of spouse when he needed care following his medical issues. In addition, the BHQ dated 12/21/21documented that the customer could perform some light tasks from home and that she could work from home. While the recent check lists of mental abilities and aptitudes to do unskilled work noted impairments in attention, carrying out simple instructions, dealing with normal work stress and appropriately accepting criticism, cognitive impairments are not described in the mental status exam.

(ECF No. 14, PageID.629.)

The language of LINA's final denial letter largely tracks this report and reasoning.  It highlights much of the same medical records that Ms. Hoyek noted, and concludes with "[i]n summary, medical documentation does not support a functional impairment beyond January 29, 2022. While exams on file documented symptoms of depression and anxiety, overall the severity of psychiatric symptoms and a functional impairment are not reflected in the mental status exams."  (ECF No. 14, PageID.649.)  The letter notes Plaintiff's struggles with depression, particularly as related to her daughter in the hospital, but also notes such positive reports as: the March 15, 2022 office visit note that Plaintiff was feeling optimistic; a January 18, 2022 office visit note that Plaintiff presented with "normal speech, an anxious mood, and her attention and functional status was intact;" an April 19,

2022 note indicating that Plaintiff presented with "euthymic mood, flat affect, normal speech, an intact memory, good attention and concentration and a moderately impaired functional status;" and (though outside the claims period) a May 26, 2022 note that Plaintiff presented with a "positive affect and reported that she had been caring for her husband."  (ECF No. 14, PageID.648-49.)

This is not a situation where Defendant or LINA inappropriately "cherry-picked" the record only for those records supporting a denial.  *See Spangler v. Lockheed Martin Energy Sys., Inc*., 313 F.3d 356, 361–62 (6th Cir.2002) (concluding it is arbitrary and capricious for an insurance provider to rely on a vocational consultant's report in making a disability determination where the provider "cherry picked" the insured's file "in hopes of obtaining a favorable report").  At most, this a situation where the administrative record contains some notations leaning toward a disability finding and some leaning against.  And "when the record contains evidence that could support a rational decision in either direction (that a plan participant was or was not disabled), the administrator's choice between this conflicting evidence cannot be considered arbitrary on substantive grounds." *Autran v. Procter & Gamble Health & Long-Term Disability Benefit Plan*, 27 F.4th 405, 411–12 (6th Cir. 2022) (citing *Davis*, 980 F.3d at 549); *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010); *Hurse v. Hartford Life & Accident Ins. Co*., 77 F. App'x 310, 318 (6th Cir. 2003)).

23

Under the arbitrary and capricious standard, an administrator's decision should not be overturned "simply because there is substantial evidence that could have supported a different outcome." *Jackson*, 761 F. App'x at 544 (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "So long as there is a reasoned explanation, based on the evidence, for an administrator's decision, that decision is not arbitrary and capricious." *Id.* (citing *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009)).

In *Schwalm,* the Sixth Circuit addressed a similar case and concluded the insurance company was not arbitrary or capricious in its denial:

> [T]he administrative record does provide some contradictory evidence. Dr. Covington's records alone contain numerous statements suggesting physical and cognitive impairment, as well as a substantial number of statements suggesting exactly the opposite. Indeed, as Schwalm emphasizes, Dr. Covington's records often contain contradictory evidence from the same visit. Still, the evidence suggesting that Schwalm suffered from a continuing disability is not so one-sided that the decision to deny benefits can be considered arbitrary or capricious.

*Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 312 (6th Cir. 2010).  As in *Schwalm*, the evidence here is not so one-sided that LINA's decision "can be considered arbitrary or capricious."  Likewise, I do not agree with Plaintiff that the record reflects Defendant wholly, and arbitrarily, ignoring the opinions of Plaintiff's treating physicians.  The record reflects a review of the medical records.  That Defendant ultimately found Plaintiff to have not met the definition of

Disabled under the Plan is not to say that it arbitrarily ignored any medical record which indicated her condition was severe. Defendant reviewed the records and explained its decision to a degree necessary to withstand judicial review.

In making this recommendation, I am keenly aware that the arbitrary and capricious standard is extremely deferential, and Defendant's decision must be upheld if it is supported by substantial evidence. "An administrator's decision will pass muster under this substantial-evidence test if a rational person could conclude that the evidence was 'adequate' to justify the decision." *Autran*, 27 F.4th at 411–12 (citing *Davis*, 980 F.3d at 549). "In other words, though the [arbitrary and capricious] standard is not without some teeth, it is not all teeth. An 'extremely deferential review,' to be true to its purpose, must actually honor an 'extreme' level of 'deference' to the administrative decision." *McClain*, 740 F.3d at 1064.

The arbitrary and capricious standard is met "if [the administrator's decision] is the result of a deliberate, principled reasoning process and … is supported by substantial evidence." *Balmert v. Reliance Std. Life Ins. Co.,* 601 F.3d 497, 501 (6th Cir. 2010) (internal quotation marks omitted). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Davis v. Hartford Life & Accident Insurance Company,* 980 F.3d 541, 549 (6th Cir. 2020) (quoting *General Med., P.C. v. Azar,* 963 F.3d 516, 520 (6th Cir.

2020)).  This standard is easily met in this case.  Defendant's records indicate a deliberate, principled reasoning process, with multiple notifications to Plaintiff to allow her to submit more information.  Because there is substantial evidence supporting Defendant's decision, the Court should **GRANT** Defendant's motion for judgment.

### D.    Conclusion

The Court should **DENY** Plaintiff's Motion for Summary Judgment (ECF No. 17) and **GRANT** Defendant's Motion for Judgment on the Administrative Record. (ECF No. 16.)

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc*. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc*. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated:  February 26, 2024

Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE